# THE CARMAN LAW OFFICE

Attorneys at Law
666 Old Country Road
Suite 501
Garden City, New York 11530
(516) 683-3600
Facsimile
(516) 683-8410

JOHN F. CARMAN, ESQ.
SUSAN SCARING CARMAN, ESQ.

OF COUNSEL
MATTHEW W. BRISSENDEN, ESQ.
JONATHAN EDELSTEIN, ESQ.
PARALEGAL
ANNA M. SACCO

May 1, 2026

**VIA ELECTRONIC CASE FILING**
Honorable Nina R. Morrison, U.S.D.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> **Re:    *United States v. Lu Jianwang***
> ***Docket No. 1:23-CR-316 (NRM)***

Your Honor:

I respectfully write on behalf of defendant Lu Jianwang to address two issues that arose at the pretrial conference of April 28, 2026: (1) whether a request from a foreign official for help with a personal matter would give rise to an agency relationship within the meaning of 18 U.S.C. § 951; and (2) whether evidence of acts Lu allegedly committed at the behest of "CC-1" in 2018 and 2020 are admissible under Fed. R. Evid. 404(b).  For the reasons set forth below, defendant takes the position that requests to address private matters fall outside the scope of § 951 and that evidence of his alleged assistance to CC-1 should not be admitted.

## I.    § 951 Is Not Violated by Assisting Foreign Officials in Personal Matters.

It is settled law that 18 U.S.C. § 951 "covers a narrower subset of foreign agents" than FARA.  United States v. Manafort, 318 F. Supp. 3d 1, 5 n.3 (D.D.C. 2018). "FARA's definition of 'agent' is much broader than Section 951's definition of 'agent,'" embodying "less formally defined" and "more episodic" behavior at, *inter alia*, the "request" of a foreign principal, while "Section 951 expressly defines 'agent' in narrower terms." United States v. Liang, 2024 WL 3431171, at *7 (D. Mass. 2024).

In other words, if a particular act does not give rise to an agency relationship within the meaning of FARA, then it *ipso facto* does not establish such a relationship under § 951.

At least one appellate court has held that assisting foreign principals with private matters *does not* trigger FARA. See Attorney General of U.S. v. The Irish People, Inc., 684 F.2d 928, 937-38 (D.C. Cir. 1982).  In its discussion of FARA, the Irish People court stated as follows:

Before discussing the actual language of the statute, it merits mentioning that the Act is found in Title 22 of the U.S. Code, "Foreign Relations and Intercourse," at Chapter 11, "Foreign Agents and Propaganda." This is an immediate indication that we are dealing here with a statute whose underlying nature is rooted in international political considerations and the conduct of foreign policy. This also reflects, as should be kept in mind throughout our review of the statute and its history, that a deliberate major concern of Congress was to require the disclosure of the foreign principal behind propaganda activities.

These considerations are reflected most strongly in the Act's provisions themselves. In s 611, the definitional section, one criterion of an "agent of a foreign principal" is that he "engage( ) within the United States in political activities for or in the interests of such foreign principal."26 "Public-relations counsel" are limited to persons representing a principal in matters "pertaining to political or public interests, policies, or relations of such principal."27 Section 611(e) "government of a foreign country," s 611(f) "foreign political party," s 611(j) "political propaganda," s 611(o) "political activities," and s 611(p) "political consultant" are all naturally defined in political terms also. *The limitation of the Act to political behavior indicates its preeminent concern with international political and domestic security matters.*

[…]

Broader exemptions are set out in s 613, which declares that the requirements of s 612(a) "shall not apply to the following agents of foreign principals," and then lists seven categories of persons exempted. These categories are: "Diplomatic or consular officers"; "Official of foreign government"; "Staff members of diplomatic or consular officers"; "Private and nonpolitical activities; solicitation of funds"; "Religious, scholastic, or scientific pursuits"; "Defense of foreign government vital to United States defense"; and "Person qualified to practice law." With the exception of the last category, it is clear that all the exemptions are rooted in either foreign policy concerns or can be explained by the fact that Congress was interested in monitoring public and political activities, *rather than private, nonpolitical, religious, scholastic, scientific, or similar activities which have only an attenuated relationship to foreign policy and national security.*

Id. (emphasis added). "The lack of interest which Congress had in 'nonpolitical' and 'private' matters is restated in the legislative history of this section." Id. at 938 n.33.

Thus, although the undersigned's research does not reveal any cases dealing specifically with the application of § 951 to American citizens who assist foreign government officials with personal or private matters, the combined effect of the above authorities is inescapable: § 951 is narrower in scope than FARA, and assistance with private matters is outside the scope of FARA, so it is therefore also outside the scope of § 951. This Court should thus find that, to the extent that Lu assisted any PRC official or officials with personal matters, such assistance did not render him an agent within the meaning of § 951, did not trigger an obligation to register, and did not constitute an offense. This Court should also so instruct the jury.

## II.      Evidence Concerning CC-1 Should Not Be Admitted.

It is defendant's understanding that at the April 28, 2026 conference, this Court found that acts which defendant allegedly performed at the request of CC-1 were not intrinsic to the charged offense, but that it remained open whether evidence of these acts would be admitted under Rule 404(b).  The government contends that these alleged acts should be admissible on the issues of intent, knowledge, motive, lack of accident, and/or absence of mistake because they bear "all of the classic hallmarks of PRC transnational repression." Defendant submits that such acts do not bear any such "hallmarks" when they are requested by a member of the Chinese diaspora living in the United States with no rank or role in the PRC government.

To defendant's knowledge, CC-1 is a long-time resident of Queens who is the president of a small Chinese community association. Allegedly, CC-1 asked Lu for information concerning "two individuals of Chinese descent," identified as Victim-1 and Victim-2, who the government acknowledges to be "subjects of ongoing legal disputes." (Gov't Mot. in Limine at 3). The government claims that in 2018, CC-1 texted Lu regarding "a group of individuals," including Victim-1, "who purportedly defrauded others of money in the PRC and fled to the United States," and asked *inter alia* whether there was "any way to deport Victim-1 back to China." (Id. at 4). Later, in 2020, CC-1 allegedly asked for help locating Victim-2 "in connection with a pending lawsuit." (Id.)

Notably, the government does not contend that Lu *actually provided* any help or advice about deporting Victim-1, or for that matter that he was even capable of providing such help.

Defendant submits that none of this, involving communications from a private citizen about other private citizens who were admittedly involved in legal disputes, was anything that a reasonable person would believe to constitute "transnational repression." It is commonplace to ask acquaintances for information that might help with a lawsuit. It is less commonplace and sometimes regrettable to vent about opponents in lawsuits and to wish consequences such as deportation on them, but it happens. Such discussions, especially in the absence of any alleged representation by Lu that he would or could help deport Victim-1, are no more probative of Lu's knowledge, intent, motive, plan, or otherwise to assist the PRC in "transnational repression" than a non-Chinese American doing a favor for a friend or colleague would be probative of his intent or plan to be recruited by the CIA.

During the conference, this Court referenced <u>United States v. Townsend</u>, 2007 WL 1288597 (S.D.N.Y. 2007); however, defendant submits that <u>Townsend</u> is readily distinguishable.  In <u>Townsend</u>, where the defendant faced drug and firearm charges after making a controlled sale to a CI, the government sought to admit three categories of uncharged-act evidence: (1) two prior occasions where Townsend sold handguns to the same CI; (2) prior occasions when the CI witnessed Townsend carrying a gun while engaged in narcotics transactions; and (3) a 9mm handgun, marijuana, and a scale containing crack cocaine which were recovered during a subsequent search. The court first held that only the subsequently-recovered gun and scale were intrinsic to the crimes of which Townsend were charged. <u>See id.</u> at *2-4. The court also found that it was premature to admit any of the evidence as 404(b) proof on the issue of intent. <u>See id.</u> at *5, however, that evidence in the first category was admissible as background to show the relationship of trust between Townsend and the CI. <u>See id.</u> at *6.

In this case, where the agency relationship is alleged to have been between Lu *and PRC Official-1*, any "background" concerning Lu's relationship *with CC-1,* who was not a Chinese official and who is not alleged to have introduced Lu to PRC Official-1 and/or acted jointly with Lu and PRC Official-1, is of no more relevance than Lu's relationship to any other Chinese-American acquaintance in Queens.

This Court also referenced <u>United States v. Graham</u>, 51 F.4th 67 (2d Cir. 2022) and <u>United States v. Downing</u>, 297 F.3d 52 (2d Cir. 2002), which defendant submits are also readily distinguishable. In <u>Graham</u>, where the defendant was charged with *inter alia* bank fraud, the Second Circuit upheld admission of evidence that she engaged in a check-fraud scheme "at the same time as the charged conspiracy, with the same coconspirators, and with the same hallmarks – unconventional financial techniques used to purportedly discharge debt." <u>Graham</u>, 51 F.4th at 82.[1] In this case, even if the alleged CC-1 acts bear some similarity to charged acts in terms of being requests for information, they were obviously not done "at the same time" or "with the same coconspirators" as the acts of which Lu is charged, and the "not the same coconspirators" factor is particularly telling given that PRC Official-1 is a government official whose alleged direction and control of Lu could trigger § 951 while CC-1 is not.

In <u>Downing</u>, the Rule 404(b) evidence consisted of proof that one of the defendants had previously prepared false audit reports to facilitate a securities fraud scheme, which is exactly what he was accused of doing in the case on trial. <u>Downing</u>, 297 F.3d at 59.  Given that this defendant claimed that he didn't know about or intend to produce false audit reports in the case at bar, the court found that the prior scheme was probative of such knowledge and content. <u>Id.</u> Here, again, defendant Lu is charged with acting at the direction and control of a PRC government official, and thus, prior acts allegedly done at the request of a private citizen in Queens are irrelevant to his knowledge, intent, plan, or similar factor with respect to the conduct on trial.

At bottom, as the <u>Graham</u> court acknowledged, "[r]elevance toward a permissible purpose often turns on the similarity between the prior act and the charged offense." <u>Graham</u>, 51 F.4th at 82,

---

[1] The <u>Graham</u> court also upheld admission of a credit repair scheme that arose out of the same transaction or transactions as the charged offense, <u>see</u> <u>Graham</u>, 51 F.4th at 82-83, which is not the case with the alleged interactions between Lu and  CC-1.

citing <u>United States v. Garcia</u>, 291 F.3d 127, 137 (2d Cir. 2002). Where uncharged acts are dissimilar to the charged conduct, admission of evidence of such acts under Rule 404(b) is error. <u>See, e.g.</u>, <u>United States v. Gordon</u>, 987 F.2d 902, 908 (2d Cir. 1993). In this case, where the essential element of the crime charged is that Lu acted *at the direction and control of a foreign government*, anything he may have done at the request of a private person is simply not similar.

Finally, the undersigned very much doubts that the government would be offering evidence of Lu helping an acquaintance with a private lawsuit if that acquaintance were not Chinese-American. The government's position appears to be that because CC-1 was ethnically Chinese and an officer of a Chinese community association, then any request for information he might make about a private matter is a "hallmark" of "transnational repression." This is a form of stereotyping that the courts should not countenance. The alleged CC-1 acts should not be admitted.

The Court's consideration in this matter is appreciated.

Respectfully submitted,

/s/ John F. Carman
John F. Carman
(JC 7149)

cc: All Counsel (Via ECF)